COURT OF APPEALS
DECISION
DATED AND FILED

December 29, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP2383-CR**

Cir. Ct. No. **2014CF1721**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

DAIMON VON JACKSON, JR.,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Racine County: FAYE M. FLANCHER and MARK F. NIELSEN, Judges. *Affirmed.*

Before Neubauer, Reilly and Grogan, JJ.

¶1 GROGAN, J. Daimon Von Jackson, Jr. appeals from a judgment of conviction entered after his no contest plea to second-degree reckless homicide as a repeater with the use of a dangerous weapon contrary to WIS. STAT. §§ 940.06(1)

(2013-14),[1] 939.62(1)(c), and 939.63(1)(b) (hereinafter "second-degree reckless homicide"), and from an order denying his postconviction motion seeking to withdraw his plea.[2]  On appeal, Jackson asserts he should be allowed to withdraw his plea because: (1) he received ineffective assistance of trial counsel; (2) the circuit court erred in denying his request to have trial counsel replaced; and (3) the interests of justice require plea withdrawal or resentencing to correct a miscarriage of justice.  Because we conclude Jackson's trial counsel was not ineffective, the circuit court did not err in denying Jackson's request to replace trial counsel, and the interests of justice require neither plea withdrawal nor resentencing, we affirm.

## I.  BACKGROUND

¶2     On December 15, 2014, the State filed a Complaint charging Jackson with multiple counts related to the death of Maurice Carter.  The State charged Jackson with: (1) one count of felony murder party to a crime (PTAC) as a repeater while using a dangerous weapon contrary to WIS. STAT. §§ 943.32(2), 940.03, 939.05, and 939.62(1)(c); (2) possession of a firearm by a felon—PTAC contrary to WIS. STAT. §§ 941.29(2)(a),[3] 939.50(3)(g), and 939.05; and (3) armed robbery with use of force—PTAC as a repeater contrary to WIS. STAT. §§ 943.32(1)(a) and (2), 939.50(3)(c), 939.05, and 939.62(1)(c).  As the basis for

---

[1] All references to the Wisconsin Statutes are to the 2013-14 version unless otherwise noted.

[2] The Honorable Faye M. Flancher entered the judgment of conviction.  The Honorable Mark F. Nielsen entered the postconviction order.

[3] 2015 Wis. Act 109, § 8 repealed WIS. STAT. § 941.29(2) (2013-14).  2015 Wis. Act 108, § 6 renumbered § 941.29(1) to § 941.29(1m) and amended subsection (1m) to read, as relevant here, that "[a] person who possesses a firearm is guilty of a class G felony if any of the following applies:  (a) The person has been convicted of a felony in this state."

the charges, the State alleged that on December 11, 2014, Jackson was involved in Carter's death and that Carter's death occurred during the course of an attempted robbery with use of a dangerous weapon.

¶3      Per the Complaint, Jackson and two other individuals, Bobby Henderson and Travenn Webster, drove to the 1000 block of Grand Avenue in Racine, Wisconsin, where two of the men approached Carter. Tauries Murry, who witnessed the altercation between Carter and the two men from his nearby vehicle, described the suspects to police. He described the first suspect "as a shorter, fat, caramel-skinned black male wearing a light grey hoodie and grey sweatpants." He described the second suspect as "taller, dark skinned, wearing a black sweatshirt and black hat." Murry reported "he heard at least one gunshot and" saw "Carter fall to the ground." He also reported having seen the two men lean over Carter after Carter had fallen to the ground and that it looked like the two men were "going through [Carter's] pockets."

¶4      Officers found a handgun ammunition magazine with Henderson's fingerprints at the crime scene. The following morning, December 12, 2014, officers conducted a traffic stop involving Henderson, "who admitted his involvement." Henderson identified Jackson and Webster as having also been involved. According to Henderson, Webster dropped him and Jackson off with the plan that he and Jackson would rob Carter and Murry. Henderson reported he was heading toward Murry's vehicle when "he heard Jackson scuffling with Carter at which time he heard two gunshots" and that Jackson later stated he shot Carter because he believed Carter had a gun.

¶5      Jackson was involved in a separate traffic stop on December 12, 2014. The officers took Jackson to the police station subsequent to the stop, but

he was not under arrest or in custody at that time. When officers initially spoke to Jackson, he denied having any knowledge of the Carter incident. Jackson was eventually placed under arrest during the course of the interview and officers administered *Miranda*[4] warnings. After the *Miranda* warnings were administered, Jackson admitted his involvement and asserted he had been "acting as a lookout for the robbery," that he did not shoot Carter, and that they did not intend to kill Carter.

¶6 Jackson made an initial appearance on December 15, 2014, and he entered not guilty pleas on all counts on January 22, 2015. Multiple attorneys represented Jackson throughout the course of this case. His first attorney moved to withdraw at the July 28, 2015 status hearing, citing a breakdown in attorney-client communication. The circuit court granted counsel's motion and explained to Jackson that "[t]his is not going to be a revolving door. You're not going to come back and back to this Court and say I want another lawyer. There's been a breakdown until you get a lawyer that you're satisfied with. The next lawyer you get is the lawyer you're going to have to keep."[5] Jackson confirmed he understood.

¶7 The Wisconsin State Public Defender (SPD) subsequently appointed another attorney to represent Jackson. Like his first attorney, Jackson's second attorney also sought to withdraw—this time within a matter of weeks—due to a breakdown in communication stemming from an acrimonious relationship

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[5] The Honorable Eugene A. Gasiorkiewicz presided over this status hearing, as he initially presided over this matter before it was transferred to the Honorable Faye M. Flancher.

between counsel and Jackson's mother. Jackson did not object to the withdrawal and the court granted counsel's motion. The court again reminded Jackson "that this is not going to be a revolving door, so it's not, you're not going to be allowed to come back to this courtroom and ask for additional lawyers until you get one that you are comfortable with[.]" Jackson again confirmed he understood.

¶8 The SPD appointed a third attorney for Jackson on September 28, 2015. During the course of his representation, counsel filed a ***Miranda-Goodchild***[6] motion seeking to exclude Jackson's admission that he was the lookout during the incident that resulted in Carter's death. The circuit court held a hearing on Jackson's motion on January 8, 2016, and on February 22, 2016, the court issued a written order denying Jackson's motion.[7] During the course of his representation, Jackson's third attorney also successfully sought dismissal of count three of the Complaint (armed robbery with use of force as PTAC).[8]

¶9 Jackson's trial was set for March 1, 2016; however, on February 23, 2016, at what was supposed to be the final pretrial conference, the court addressed the State's motion for an adjournment because Webster—who the State needed to call as a trial witness—was unavailable. At the February 23 conference, Jackson's attorney informed the court that Jackson did not feel counsel had represented his best interests and that Jackson had "multiple complaints" about him. When the court explained that counsel was not Jackson's "hand puppet" and that counsel

---

[6] ***Miranda***, 384 U.S. 436; ***State ex rel. Goodchild v. Burke***, 27 Wis. 2d 244, 133 N.W.2d 753 (1965).

[7] Judge Gasiorkiewicz presided.

[8] Count three was dismissed as duplicative of count one.

5

would not necessarily "do everything you [Jackson] ask him to do[,]" Jackson responded that counsel "hasn't done nothing I asked him to do." The court thereafter rejected Jackson's attempt to discharge his third attorney. However, the court ultimately granted a subsequent withdrawal request because of a medical issue that rendered the third attorney unavailable.

¶10 The SPD appointed Jackson's fourth attorney (hereinafter "trial counsel") on March 11, 2016. Trial counsel attended hearings on March 17, March 24, August 9, and October 17, 2016. At the August 9 hearing, the court set November 1, 2016, as the new trial date. The court held a final pretrial conference on October 17, 2016, at which time the court also addressed Jackson's pro se motion asking for a new lawyer to replace trial counsel.[9] When the court asked Jackson why he wanted trial counsel to withdraw, Jackson stated trial counsel "doesn't keep in contact with me. He hasn't been properly representing me at all. He hasn't filed any motions on my behalf that I asked him about. He hasn't done anything for me." The following exchange between the court and Jackson ensued:

> THE COURT: Well, just because you ask [trial counsel] to file motions, doesn't mean that he will or should.
>
> [JACKSON]: But if he says he --
>
> THE COURT: Stop. Please don't interrupt me when I'm speaking. That's my one rule. I give you the courtesy of listening, I expect the same of you. This is a case that is over two years old. You have had a number of other attorneys representing you.
>
> I can see that [third counsel] represented you. This has been scheduled for trial many times. The information was filed back on January 22nd of 2015. I will not allow [trial

---

[9] Judge Flancher presided.

6

> counsel] to withdraw, whether it be on your request or anyone else's.
>
> So, [trial counsel], I ask that you meet with [Jackson] and that you also be prepared to proceed on November 1st. Again it is the number one trial.

Trial counsel's next meeting with Jackson was on the trial date.

¶11 Prior to trial, in an email dated October 17, 2016, the State presented a plea offer in which it agreed to amend the felony murder PTAC charge to second-degree reckless homicide PTAC as a habitual offender while armed, dismiss and read in count two, dismiss and read in the charges filed in Racine County case No. 2016CF252,[10] and to recommend prison without requesting a specific term of imprisonment. Although the State indicated in the email that the offer would remain "open until the Friday before the trial[,]" it told the court the same day that it would agree to leave all offers open until the day of trial.

¶12 On November 1, 2016, the scheduled trial date, trial counsel met with Jackson to discuss whether to proceed to trial or to accept the plea offer where Jackson would plead to second-degree reckless homicide in exchange for a dismissal of the felon-in-possession charge and all the drug charges in his other case.[11] Jackson ultimately chose to plead no contest to second-degree reckless homicide as a repeater with use of a dangerous weapon.

---

[10] Racine County case No. 2016CF252 involved multiple felony drug charges. Trial counsel represented Jackson in that matter as well.

[11] Nothing in the record clearly explains why the offer Jackson ultimately pled to was second-degree reckless homicide *without* the PTAC added as opposed to a prior offer of second-degree reckless homicide as PTAC. What the record does show is that "PTAC" is crossed out on the plea questionnaire, which Jackson admitted he signed and reviewed. Moreover, the plea questionnaire has only the second-degree reckless homicide elements attached to it—not PTAC.

¶13  At the plea hearing on November 1, 2016, the circuit court put Jackson under Oath before conducting the plea colloquy.[12]  The circuit court confirmed Jackson understood the elements of that charge and clarified he was not pleading as party to a crime.  Prior to accepting Jackson's plea, the circuit court also confirmed with Jackson that he had reviewed the Amended Information with trial counsel.[13]  At the State's request, the circuit court further confirmed Jackson did not need additional time to speak with his attorney regarding the fact he was not pleading to the second-degree reckless homicide as PTAC, as well as that he was satisfied with trial counsel's representation.  The circuit court thereafter accepted Jackson's no contest plea.  Pursuant to the plea agreement, count two— possession of a firearm by a felon as PTAC—was dismissed but would be read in at sentencing, and the three charges of manufacture or delivery of cocaine as a second and subsequent offense in case No. 2016CF252 were dismissed but would be read in at sentencing.  The circuit court withheld sentencing to allow time for completion of a presentence investigation (PSI).

¶14  Sentencing was initially scheduled for January 17, 2017; however, the court adjourned sentencing after granting trial counsel's request to withdraw due to Jackson having filed a grievance against him with the Office of Lawyer Regulation (OLR).  The public defender's office appointed Jackson a new attorney (hereinafter "sentencing counsel") on February 27, 2017.

---

[12]  Judge Flancher presided.

[13]  The Amended Information included two counts:  (1) second-degree reckless homicide as a repeater with use of a dangerous weapon; and (2) possession of a firearm by a felon as PTAC.

¶15　The sentencing hearing ultimately took place on June 12, 2017. After reviewing the PSI, hearing argument from the State and sentencing counsel, and hearing from members of both Carter's and Jackson's families, the circuit court considered the pertinent sentencing factors. The sentencing court focused on Jackson's extensive criminal record dating back to 2003, his repeated revocation from probation, and repeated violations of conditions while on supervision. The sentencing court noted that Jackson was on federal court supervision at the time he committed this offense and that despite being twenty-seven years old without any physical or mental disabilities, he had "virtually no employment history." The sentencing court said it "fully believe[d] based on everything that [it] read" that Jackson was either "the shooter in this case or involved in this shooting." The court sentenced Jackson to a total of thirty years in prison, bifurcated to twenty years of initial confinement and ten years of extended supervision. Judgment was entered on June 13, 2017, and an amended judgment was later entered on September 12, 2017, following a restitution hearing.

¶16　On November 9, 2018, with new counsel appointed to assist with postconviction proceedings, Jackson filed a postconviction motion seeking plea withdrawal. Jackson asserted multiple grounds in support of his plea withdrawal request. First, he asserted trial counsel rendered ineffective assistance of counsel and requested a hearing pursuant to *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979). Second, Jackson requested a hearing pursuant to *State v. Bangert*, 131 Wis. 2d 246, 389 N.W.2d 12 (1986), to address his assertion that his plea was not knowing, voluntary, and intelligent due to a constitutionally insufficient plea colloquy. Alternatively, Jackson argued the circuit court had erred in denying his request to replace trial counsel prior to the trial date and that

he was entitled to a hearing pursuant to *State v. Lomax*, 146 Wis. 2d 356, 432 N.W.2d 89 (1988).

¶17    The postconviction court held a hearing on Jackson's motion on September 13, 2019.  Both trial counsel and Jackson testified.  Trial counsel confirmed he was appointed to represent Jackson in mid-March 2016 and that he had been practicing as a criminal defense attorney since 1985.  Trial counsel also confirmed he met with Jackson a total of four times—three times prior to Jackson entering his no contest plea and once after—and that he "[c]ould have done better" as to the number of times he met with Jackson.  However, trial counsel testified he did not believe the outcome of Jackson's case would have changed had he met with Jackson more frequently.

¶18    Trial counsel also confirmed he requested discovery in this matter shortly after his appointment and that although he received and reviewed a surveillance video from the Potawatomi casino, interrogation videos of Jackson, Henderson, and Webster, and DNA evidence, he did not show the videos to Jackson.  Rather, he explained he presented that evidence to Jackson via the police reports.  According to trial counsel, Jackson's prior attorneys had also discussed the facts with Jackson and had provided Jackson with evidence and discovery, including police reports.

¶19    After Jackson waived attorney-client privilege, trial counsel described Jackson's decision to accept the State's plea offer.  According to trial counsel, Jackson's decision to accept the offer was based at least in part on the "[s]trength of the State's case" as to the pending charges, which included anticipated testimony from Jackson's two co-actors, Henderson and Webster, who would identify Jackson as the shooter.  Trial counsel also confirmed he reviewed

CCAP entries for Henderson and Webster to determine what they were to receive in exchange for testifying against Jackson and that he had requested that the State provide any further consideration not reflected in those entries.

¶20     Trial counsel stated the primary defense strategy was to attack the credibility of Henderson's and Webster's testimony and that in preparing for trial, he reviewed the reports, the evidence, and spoke with Jackson.  Based on his time sheets, trial counsel testified he spent 5.9 hours reviewing discovery, evidence, and transcripts, 6.5 hours reviewing Jackson's interrogation, 2.2 hours reviewing Webster's interrogation, 8 hours reviewing other materials, and 0.5 hours reviewing the transcript from the *Miranda-Goodchild* hearing.[14]  He also testified to having spent 1.3 hours meeting with Jackson on November 1, 2016.

¶21     As to the plea colloquy, trial counsel testified he had reviewed the plea offer, the elements of second-degree reckless homicide as a repeater while armed, the plea questionnaire, and the waiver of rights form with Jackson.  The plea questionnaire showed that although the charge was identified as "second degree reckless homicide PTAC (while armed)[,]" "PTAC" was crossed out.  Trial counsel did not recall Jackson having indicated a lack of understanding as to his plea.

¶22     Jackson also testified at the postconviction hearing.  He testified about his concerns with trial counsel's purported "lack of preparation" and "communication[,]" as well as his attempts to contact trial counsel personally, "through family[,]" and through the public defender's office.  Jackson further

---

[14] The postconviction court found that trial counsel spent "23.4 hours … reviewing the discovery."

11

testified that although none of his attorneys had reviewed video evidence with him, prior counsel had provided him with copies of the police reports, autopsy reports, civilian statements, and co-defendant statements.

¶23    As to his interactions with trial counsel on November 1, 2016—the date of his no contest plea—Jackson testified he spoke with trial counsel regarding the State's plea offer and that he did not believe trial counsel was prepared for trial based on his limited communication with trial counsel.[15]  Jackson confirmed he went over the plea questionnaire and waiver of rights with trial counsel and that he signed the questionnaire.  Jackson admitted during his testimony at the *Machner* hearing that PTAC was crossed off on the plea questionnaire.  Jackson also confirmed he was not under the influence of anything, that he had an HSED, and he was able to read and write when he entered his plea.  Although he testified trial counsel went over the elements of the crime he was pleading to—second-degree reckless homicide as a repeater with a dangerous weapon—Jackson denied that the elements were presented in writing or attached to the plea questionnaire during his conversations with trial counsel.  He further testified trial counsel told him he "wouldn't be able to beat party to a crime."

¶24    According to Jackson, he chose to accept the State's plea offer rather than proceed to trial because he "didn't have a choice.  If I would have went in with [trial counsel, who] wasn't prepared for trial, I would have got a life sentence versus getting something that was possibly frees [sic]."  He further testified trial counsel had explained that if he accepted the plea, Jackson would be "facing

---

[15] At the plea hearing, Jackson confirmed he understood that trial counsel had been prepared to proceed to trial that day.

reasonable time versus substantial time" and that trial counsel recommended he accept the plea because he "couldn't beat the party to a crime of felony murder and armed robbery."

¶25 The postconviction court issued a thirty-five page written decision on November 14, 2019, thoroughly explaining its denial of each issue raised in Jackson's motion.[16]

¶26 First, the postconviction court addressed the purported defects in the plea colloquy and ultimately determined Jackson's plea was knowing, intelligent, and voluntary. It began by identifying the claims Jackson raised: (1) the circuit court did not tell Jackson the elements of the amended charge; (2) the circuit court did not advise him it did not have to follow the plea agreement; and (3) the circuit court did not explain the difference between pleading and not pleading to PTAC liability. The postconviction court rejected Jackson's claim that the circuit court did not warn him it was not required to follow the parties' recommendations because: (1) that statement was on the change-of-plea questionnaire Jackson signed; and (2) the State followed its agreement to recommend prison without

---

[16] Jackson raised three arguments in his postconviction motion. First, he claimed he received ineffective assistance because trial counsel: (1) "only met with Mr. Jackson three times outside of court"; (2) failed to timely request discovery; (3) waited until the day before trial to ask for plea agreements his codefendants had with the State; (4) "never reviewed the discovery with" him; (5) failed to "develop a defense strategy that would allow [him] to make a knowing, intelligent and voluntary decision" about proceeding to trial or accepting a plea offer; (6) let Jackson "plead guilty as a principal" despite evidence that others "were directly involved in shooting" the victim; and (7) counsel's representation caused a "miscarriage of justice."

Second, in the alternative, he moved the court to vacate his judgment of conviction because his plea colloquy was purportedly deficient and violated *State v. Bangert*, 131 Wis. 2d 246, 389 N.W.2d 12 (1986). Third, also in the alternative, he requested that the judgment of conviction be vacated because the circuit court erroneously denied his request for new counsel.

arguing for a specific period of confinement. The postconviction court's written order explained that although the circuit court had not read the elements of second-degree reckless homicide by use of a dangerous weapon as repeater into the record, the elements had been attached to the change-of-plea questionnaire Jackson signed and that Jackson confirmed he was aware of the elements.

¶27 As to the alleged plea colloquy deficiency regarding the fact that the second-degree reckless homicide charge was not PTAC, the postconviction court concluded "the record was explicit that the defendant was pleading as a principal rather than an accomplice or conspirator. The [circuit] court could not have been clearer in explaining … in plain terms that regardless of his understanding of party to a crime liability, he was in fact pleading as a principal." This included the circuit court's inquiry as to whether Jackson wanted more time to discuss pleading to commission of the crime versus pleading as PTAC and Jackson declined the opportunity to do so. The postconviction court concluded: "There is clearly no failure on the part of the trial court to conduct an adequate colloquy on this issue, and the defendant waived any current argument that he needed more explanation when he declined the opportunity at the plea hearing."[17]

¶28 The postconviction court flatly rejected Jackson's contention that he was confused by the circuit court's colloquy, believing that he was pleading as an

---

[17] Jackson did not assert a plea withdrawal challenge based on a breach of the pretrial offer by the State or that there was a defect in the plea colloquy as to the fact that the armed robbery with use of force charge had been dismissed. There is nothing in the plea colloquy indicating there was any misunderstanding by Jackson or the attorneys as to either of these issues, and although the circuit court had inadvertently referenced the armed robbery with use-of-force charge at the final pretrial hearing, there was no indication at the change-of-plea hearing that the circuit court was confused about whether that charge had been dismissed. Thus, neither of these issues were addressed by the postconviction court, and as is evident in our discussion, neither of these issues have been raised on appeal.

14

accomplice and not a principal. The court stated: "The trial judge specifically inquired whether the defendant was pleading as a party to crime and was told he was not. The defendant was sitting right there and heard that. I do not credit the claim that the defendant understood that NOT pleading as a party to a crime meant that he WAS pleading as a party to the crime." The court further noted that Jackson's "no contest" plea was not making any admissions. *Id.* As to any prejudice claimed from the plea colloquy, the postconviction court stated: "Whether he plead under one theory or the other, he knew he was pleading to Second Degree Reckless Homicide and he knew what the penalties were. He was convicted as he expected to be. He was sentenced within the range he was warned about. The defendant cannot possibly make out a claim of prejudice arising from this claimed error."

¶29 Second, as to Jackson's ineffective assistance of counsel claim, the postconviction court first determined that it did *not* find deficiency as to a "laundry list" of issues Jackson raised, including: (1) potential violations of the rules of professional conduct related to trial counsel's representation of Jackson; (2) trial counsel's review of discovery and trial preparation; (3) trial counsel's purported failure to follow Jackson's instructions regarding motions Jackson wanted to pursue; (4) trial counsel's not having reviewed the transcript of the *Miranda-Goodchild* hearing until shortly before the scheduled trial date; and (5) trial counsel's failure to review the DVD evidence with Jackson.

¶30 The postconviction court then identified the "core" of Jackson's complaints as a "failure to keep in communication with his client and to establish an attorney client relationship." The postconviction court concluded that although it "cannot point to a particular harmful consequence of [trial counsel's] failure [to communicate]," trial counsel was nevertheless deficient based on his failure to

15

visit and confer with Jackson more frequently. The postconviction court specifically addressed Jackson's contention that his trial counsel was not prepared for trial and the interrelationship between communication and preparedness. It found the case was ready to go to trial, trial counsel was prepared, and lack of communication does not have a direct correlation to preparedness.[18]

¶31 Despite concluding trial counsel's failure to confer and meet with Jackson constituted deficient performance, the postconviction court determined this deficient performance did not prejudice Jackson. In reaching its conclusion, the postconviction court found Jackson was "not a credible witness"[19] and therefore did not accept Jackson's assertion he would have rejected the plea offer and would have instead proceeded to trial had trial counsel communicated more effectively. Rather, the court explained:

> Jackson fired or attempted to fire all four [of his attorneys] due to his perception that each was not serving his best interests and did not visit him enough. This leads the court

---

[18] Jackson did not raise any concerns regarding the submission of jury instructions or witness lists when identifying the alleged unpreparedness of counsel. Thus, this issue was not addressed by the postconviction court, nor has it been raised by Jackson in this appeal.

[19] The Dissent casts aside the credibility findings made by the postconviction court and decides it is in a better position to determine credibility—contrary to longstanding law that the circuit court who hears and sees the witnesses is the court better equipped to make credibility findings. *See* **State v. Carter**, 2010 WI 40, ¶19, 324 Wis. 2d 640, 782 N.W.2d 695 ("this court will not exclude the circuit court's articulated assessments of credibility and demeanor, unless they are clearly erroneous"); **Jezeski v. Jezeski**, 2009 WI App 8, ¶8, 316 Wis. 2d 178, 763 N.W.2d 176 ("Unless the testimony is inherently incredible, an appellate court may not substitute its *judgment* for that of the fact finder." (emphasis added)); **State v. Angiolo**, 186 Wis. 2d 488, 495-96, 520 N.W.2d 923 (Ct. App. 1994) ("When the testimony presented at the hearing conflicts, the trial court is the ultimate arbiter of the credibility of witnesses. Further, if a trial court fails to make a finding of fact that appears from the record to exist, an appellate court may assume the fact was determined in support of the decision." (internal citation omitted)); WIS. STAT. § 805.17(2) (2019-2020) ("Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.").

> to conclude that any anxiety the defendant felt about being represented by [trial counsel] was not necessarily occasioned by anything having to do with [trial counsel] and was instead occasioned by the frustration of a defendant who discovered that none of his attorneys possessed a "magic wand" to make his case better than it was. This history undermines Mister Jackson's credibility, and I do find that he is not a credible witness.
>
> ….
>
> Mister Jackson had good reason to fear trial, given the evidence against him and without regard to his opinion of his attorney. The record supports [trial counsel's] testimony at the hearing that the defendant decided to forego trial and take the plea because of the strength of the State's case against him. I accept [trial counsel's] testimony on the content of his plea conversation with Jackson as credible.

(Internal citation omitted.) The postconviction court went on to note that Jackson "had objectively good reasons to take the benefit of the plea that was offered, again without regard to his opinion of [trial counsel]" due to the significant reduction in Jackson's incarceration exposure on the amended charge and to the dismissals of the remaining charge in this matter and of multiple charges in the pending drug-related matter. The postconviction court specifically noted that despite the twenty-six years of initial incarceration Jackson potentially faced on the charge he pled no contest to, that exposure was "dwarfed by the 45 years of initial incarceration he faced if convicted on the charges in the Information at trial and is also less than the 27 years of initial incarceration he faced on the drug charges."

¶32    The postconviction court likewise rejected "Jackson's claim that his plea was coerced by [trial counsel's] errors," noting Jackson's claim was "contradicted by [Jackson's] own statements at the time of the change of plea." Specifically, the court pointed to the signed plea questionnaire form, Jackson's

responses to the circuit court during the plea colloquy as to his understanding of the charge he was pleading to, and Jackson's confirmation that he was satisfied with trial counsel's representation.[20]

¶33 The postconviction court likewise rejected Jackson's assertion that he was entitled to plea withdrawal based on the circuit court's refusal to grant his motion requesting another new attorney. It identified the following in explaining its reasons for doing so: (1) Jackson made similar complaints about each of his prior attorneys; (2) the trial date was just a few weeks away when Jackson made his request; and (3) the case was nearly two years old and had previously been scheduled for trial multiple times. The postconviction court distinguished Jackson's case from *Lomax*, 146 Wis. 2d 356, because the circuit court here gave Jackson an opportunity to explain why he wanted to fire trial counsel and obtain a new attorney. The postconviction court determined the circuit court's discretionary decision denying Jackson's request was not erroneous because the circuit court provided Jackson with an opportunity to explain his request and it provided sufficient reasons for denying Jackson's request. Finally, the

---

[20] The Dissent develops arguments that Jackson never made. Jackson did not assert an ineffective assistance of counsel claim based on an alleged breach of the pretrial plea offer by the State. He did not claim that there was a breach or that trial counsel failed to object to a breach. Jackson's postconviction challenge as to his plea was that the *court* did not discuss the specific elements of the charge to which he was pleading (without PTAC). Jackson's postconviction motion does not challenge his trial counsel's action with respect to the removal of PTAC at all.

Although the Dissent suggests that counsel was ineffective for agreeing that the Complaint provided a factual basis to support Jackson's plea, Jackson never asserted this as a basis for ineffective assistance, nor did he contend that his trial counsel should have corrected the circuit court during the final pretrial hearing when the circuit court inadvertently referred to the armed robbery charge, likely because, as noted, that charge had been dismissed.

Because Jackson never made these claims, the postconviction court did not address these issues under an ineffective assistance of counsel rubric and, not surprisingly, Jackson did not make these claims on appeal.

postconviction court concluded Jackson's "conviction and sentence do not present a manifest injustice on this record" and therefore did not provide a basis for plea withdrawal. Jackson now appeals.

## II. DISCUSSION

¶34 Jackson asserts three reasons he believes he is entitled to plea withdrawal: (1) he received ineffective assistance of counsel; (2) the circuit court erred in denying his request to replace trial counsel; and (3) the interests of justice so demand. He also argues this matter should be remanded for resentencing in the interests of justice. We are not persuaded.

¶35 Whether to allow a defendant to withdraw a plea is a matter within the circuit court's discretion, which we review under the erroneous exercise of discretion standard. *State v. Thomas*, 2000 WI 13, ¶13, 232 Wis. 2d 714, 605 N.W.2d 836. "We will sustain an exercise of discretion if the circuit court 'examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach.'" *State v. Cooper*, 2019 WI 73, ¶13, 387 Wis. 2d 439, 929 N.W.2d 192 (citation omitted). Findings of facts will be upheld unless clearly erroneous. *State v. Sholar*, 2018 WI 53, ¶35, 381 Wis. 2d 560, 912 N.W.2d 89.

¶36 A defendant seeking to withdraw a no contest or guilty plea after sentencing must establish a manifest injustice by clear and convincing evidence. *State v. Bentley*, 201 Wis. 2d 303, 311, 548 N.W.2d 50 (1996); *State v. Booth*, 142 Wis. 2d 232, 235, 418 N.W.2d 20 (Ct. App. 1987). A defendant can meet this standard if the defendant received ineffective assistance of counsel. *Bentley*, 201 Wis. 2d at 311. "[W]hen applying the manifest injustice test, 'a reviewing court may look beyond the plea hearing transcript' to the totality of the circumstances."

*State v. Cain*, 2012 WI 68, ¶31, 342 Wis. 2d 1, 816 N.W.2d 177 (citation omitted). We therefore review "the entirety of the record to determine whether, considered as a whole, the record supports the assertion that manifest injustice will occur if the plea is not withdrawn." *Id.*

¶37    "Whether trial counsel should be relieved and a new attorney appointed is a matter within the circuit court's discretion." *State v. Jones*, 2010 WI 72, ¶23, 326 Wis. 2d 380, 797 N.W.2d 378.  On appeal, we "sustain the circuit court's decision if the court 'examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach.'" *Id.* (citation omitted).

### A.    *Ineffective Assistance of Counsel*

¶38    "A criminal defendant has the constitutional right to effective assistance of counsel." *Sholar*, 381 Wis. 2d 560, ¶32.  A defendant is denied that right when counsel performs deficiently and the deficiency is prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Pitsch*, 124 Wis. 2d 628, 633, 369 N.W.2d 711 (1985).  "An ineffective assistance of counsel claim presents a mixed question of fact and law." *State v. Pico*, 2018 WI 66, ¶13, 382 Wis. 2d 273, 914 N.W.2d 95.  We do not reverse the circuit court's findings of fact unless clearly erroneous. *Id.*  "Findings of fact include 'the circumstances of the case and the counsel's conduct and strategy,'" and those findings will not be disturbed unless clearly erroneous. *State v. Thiel*, 2003 WI 111, ¶21, 264 Wis. 2d 571, 665 N.W.2d 305 (citation omitted).  Whether counsel's performance was deficient and whether the deficient performance was prejudicial are questions of law we review de novo. *State v. Sanchez*, 201 Wis. 2d 219, 236, 548 N.W.2d 69

20

(1996).  A defendant must satisfy both prongs to establish ineffective assistance of counsel.  ***State v. Carter***, 2010 WI 40, ¶21, 324 Wis. 2d 640, 782 N.W.2d 695.

## 1.  Deficiency

¶39    "The first prong of the ***Strickland*** analysis requires us to compare counsel's performance to the 'wide range of professionally competent assistance.'"  ***Pico***, 382 Wis. 2d 273, ¶19 (quoting ***Strickland***, 466 U.S. at 690).  Counsel's conduct is deficient only if it "falls outside that objectively reasonable range[.]"  ***Pico***, 382 Wis. 2d 273, ¶19.  "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  ***Harrington v. Richter***, 562 U.S. 86, 105 (2011) (citation omitted).  We presume counsel's conduct fell within that range.  ***Strickland***, 466 U.S. at 689 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]").  "[A] defendant must show specific acts or omissions of counsel that are 'outside the wide range of professionally competent assistance.'"  ***State v. Arredondo***, 2004 WI App 7, ¶24, 269 Wis. 2d 369, 674 N.W.2d 647 (citation omitted). [21]

---

[21] As indicated above, in his postconviction motion, Jackson presented a list of vague reasons as to how trial counsel was deficient.  On appeal, Jackson asserts only that trial counsel was deficient as to lack of meeting and conferring with Jackson prior to the jury trial date.  To the extent Jackson raised additional arguments as to trial counsel's purported deficiencies before the postconviction court but does not pursue those issues on appeal, we do not address those arguments.  *See* ***A.O. Smith Corp. v. Allstate Ins. Cos.***, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998) ("an issue raised in the trial court, but not raised on appeal, is deemed abandoned").  We address only the question of whether trial counsel's communication with Jackson was deficient.

¶40 On appeal, Jackson alleges trial counsel's performance was deficient solely because he failed to properly meet or otherwise communicate with Jackson, including after the circuit court instructed him to do so two weeks prior to the scheduled trial date. Despite this assertion, Jackson has not identified *what* it was that trial counsel failed to properly communicate or *how* additional communication or meetings with trial counsel would have ultimately impacted his decision to either accept the State's plea offer or to instead proceed to trial. He also has not identified what counsel failed to do in preparing for trial despite asserting he accepted the State's plea offer because trial counsel was not prepared to proceed with trial. The postconviction court found Jackson's reason for taking the plea bargain to be *not* credible, and that finding is not clearly erroneous.

¶41 The State argues that even though trial counsel met with Jackson just four times overall, that may have been sufficient given the circumstances present here. *See **United States v. Olson***, 846 F.2d 1103, 1108 (7th Cir. 1988) (noting the court was unaware of any "'case establishing a minimum number of meetings between counsel and client prior to trial necessary to prepare an attorney to provide effective assistance of counsel'" because "an experienced attorney 'can get more out of one interview with a client' … than a less well-trained lawyer could get out of several." (citation omitted)). Trial counsel had three decades of experience representing criminal defendants at the time he was appointed here, and Jackson's three previous attorneys had already substantially prepared the case. Prior counsel had challenged Jackson's statements through a ***Miranda-Goodchild*** hearing and obtained dismissal of the third count as duplicative, and the record further demonstrates that Jackson's prior counsel provided him with all the paper discovery, the police reports, the statements from witnesses and co-defendants, and the autopsy reports. After his appointment, trial counsel spent significant time

reviewing the file and the materials, and he requested additional discovery, reviewed the surveillance video from the casino, interrogation videos of Jackson, Henderson, and Webster, and the DNA evidence. Like prior counsel, he also met with Jackson to go over the facts of the case, talk about the file, discuss potential witnesses, and review Jackson's confession to being the lookout for the robbery.

¶42 Jackson clearly wanted more communication with trial counsel, and trial counsel admitted at the *Machner* hearing that when it came to how many times he met with or otherwise communicated with Jackson about his case, he "[c]ould have done better" and that he "should have met with [Jackson]" after the circuit court instructed him to do so. We agree trial counsel could have done better and we will assume his failure to communicate constituted deficient performance. However, as did the postconviction court, we ultimately resolve this matter by addressing *Strickland*'s prejudice prong. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

## 2. Prejudice

¶43 "To prove prejudice, a defendant must establish that '*particular* errors of counsel were unreasonable' and 'that they *actually* had an adverse effect on the defense.'" *Sholar*, 381 Wis. 2d 560, ¶33 (citation omitted). On appeal, we therefore determine whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Here, Jackson must show "'that there is a reasonable probability that, but for the counsel's errors, he

would not have pleaded [no contest] and would have insisted on going to trial.'" *See* **Bentley**, 201 Wis. 2d at 312 (citation omitted). "A probability sufficient to undermine confidence exists when there is 'a substantial, not just conceivable, likelihood of a different result.'" **Cooper**, 387 Wis. 2d 439, ¶29 (quoting **Cullen v. Pinholster**, 563 U.S. 170, 189 (2011)). A self-serving statement that he would have gone to trial is insufficient to satisfy the prejudice prong. *See* **Bentley**, 201 Wis. 2d at 316. A defendant must identify facts to support his claim that but for the deficient conduct, he would have insisted on going to trial. *Id.* For Jackson, that means he must show that had additional communication occurred, he would have rejected the plea offer.

¶44 To succeed on the prejudice prong, Jackson must assert specific facts to show how more communication or an additional meeting would have made a difference in his decision to proceed to trial rather than accept the State's plea offer. Jackson, however, fails to submit anything at all. He has not alleged any specific facts—such as the substance of what those communications or meetings may have entailed—that establish **Strickland** prejudice, and he has not provided any facts to show there is a *reasonable probability* he would have made a different choice had trial counsel met or communicated with him more frequently. He does not allege that if trial counsel had met with him as instructed by the circuit court that the content of that meeting would have been any different than the content of the meeting on November 1. Jackson also fails to provide any specific facts asserting how more communication or additional client meetings would have made trial counsel better prepared to try his case, and he likewise does not tell us what he or trial counsel needed to talk about that had not already been covered. Simply put, it is insufficient to say only that counsel's lack of communication or failure to meet more often prejudiced him, and absent greater specificity, we

cannot conclude that limited communication or failure to meet before trial caused Jackson prejudice.

¶45 There is also nothing in this record to support Jackson's contention that he had to take the plea offer *because trial counsel was not prepared to go to trial*. To the contrary, the postconviction court addressed trial counsel's preparedness and found that trial counsel was prepared to go to trial. It said:

- "The case had been prepared to the verge of trial previously. All of the motion practice had been attended to. I cannot point to a particular harmful consequence of [trial counsel]'s failure."

- Jackson's "linkage" between "lack of communication [and] a lack of preparation" "is not altogether apparent." "Contact and communication, after a certain point, are not essential to trial preparation."

- "In the course of their limited contacts, [Jackson] had communicated his goals for the representation to [trial counsel]. He wanted to beat the case, which [trial counsel] understood to mean going to trial. At that point it was [trial counsel's] duty to pursue those goals. The choice of strategy was up to the attorney." (Internal citation omitted.)

The postconviction court then discussed trial counsel's obligations to prepare for the case, which included investigation, developing a trial strategy, and obtaining information to attack the credibility of Webster and Henderson, and the postconviction court found trial counsel had properly engaged in them all. Based on all of this, the postconviction court found that trial counsel was prepared and that Jackson failed to "identify—[n]either in his pleadings nor at the hearing—any piece of evidence or any witness that [trial counsel] was unaware of or not

prepared to deal with. [Trial counsel] reported ready for trial and stated that he was prepared. I have no basis in what was presented at the hearing to discredit his claim of being prepared." The postconviction court also found trial counsel credible and Jackson not credible. Jackson makes no attempt to challenge any of the postconviction court's findings as clearly erroneous.

¶46 Instead, Jackson alleged in his postconviction motion only that: (1) he "maintains his innocence" to the second-degree reckless homicide charge despite pleading no contest; and (2) the facts show that Henderson and Webster were "the two suspects involved in the shooting." In support of his second allegation, Jackson identified three pieces of evidence: (1) "Mr. Henderson's fingerprint was found at the crime scene[;]" (2) Carter's "DNA was found on Mr. Henderson's clothes[;]" and (3) "[t]he eye witness identifies suspects as Mr. Henderson and Mr. Webster as seen in the surveillance video and as arrested later that day."[22]

¶47 These facts are insufficient to establish prejudice, particularly on the basis of a lack of communication or meeting with trial counsel. Had Jackson gone to trial, he would have been facing the charges of felony murder as a party to a crime and felon in possession of a firearm as a party to a crime, *not* second-degree reckless homicide. Thus, Jackson's claimed innocence to second-degree reckless homicide is irrelevant. All the State would have had to prove to a jury was that Jackson was a party to the crime to the felony murder. *See* WIS. STAT. §§ 940.03, 939.05. The State did not have to prove Jackson actually shot the victim or that he

---

[22] The witness described the appearance and apparel of the two individuals who approached Carter but did not identify the suspects by name.

was one of the two men the eyewitness identified. Jackson admitted to being involved in the incident as Henderson's and Webster's lookout, and the circuit court ruled this statement from his confession was admissible. He was also seen with Henderson and Webster on surveillance film later that night, and Henderson and Webster were testifying against him. Trial counsel testified at the *Machner* hearing that Jackson decided to take the State's plea offer because of the "[s]trength of the State's case."

¶48     Moreover, even if trial counsel's communication with Jackson was deficient, Jackson admitted at the *Machner* hearing that prior counsel discussed the evidence and discovery with him and that prior counsel had also provided him with copies of the discovery, which included the police reports, witness statements, and co-defendant statements. He therefore knew—regardless of what trial counsel communicated to him—*who* was purportedly involved in Carter's death, *what* witnesses had described, and *how* Henderson and Webster might testify against him at trial. Trial counsel's limited communication prior to the trial date also does not negate the communication that occurred between trial counsel and Jackson in meetings on and before the scheduled trial date, which according to trial counsel, included discussing the facts of the case, potential witnesses, Henderson's and Webster's statements, and the overall strength of the State's case as to the charges Jackson would have faced had he proceeded to trial.

¶49     Finally, the plea offer allowed Jackson to plead to a single count on a lesser charge and resolve both this case and his separate pending drug case. Jackson was facing a significant period of incarceration if convicted on the original charges at trial, and he also would have ultimately faced significant exposure for multiple felony drug counts in the unrelated drug case where the State captured the drug transactions on videotape. However, by accepting the

State's plea offer, Jackson substantially reduced his exposure because the State agreed to dismiss and read in not only the felon in possession PTAC charge in this case, but also *all* of the felony drug charges in the other pending matter. As the postconviction court noted, this "reduced Mister Jackson's [sentence] exposure by ten years. The dismissal of the Felon in Possession of a Firearm charge reduced his exposure by another 14 years. The dismissal of the three counts of Delivery of Cocaine as a Repeat Drug Offender in a separate pending case reduced his exposure by another 42 years."

¶50 Based on the foregoing, we conclude Jackson failed to allege specific facts that would support his assertion that he would have proceeded to trial but for trial counsel's limited communication and failure to meet as requested by the circuit court. He neither provides us with any specific content he wanted to cover in additional communications or another meeting nor any substantive material that he did not have the chance to discuss with his trial counsel that rendered trial counsel unprepared to go to trial. He does not challenge the postconviction court's findings that trial counsel was prepared to go to trial had he decided to reject the plea offer, and the record supports the postconviction court's findings to that effect. This record therefore demonstrates there is no *reasonable* probability that Jackson would have elected to proceed to trial if trial counsel had more communication with Jackson or if the two had met another time before November 1. Because Jackson cannot establish he was prejudiced by trial

counsel's failure to communicate or meet with him more often, his ineffective assistance of counsel claim fails.[23]

## B. Withdrawal of Trial Counsel

¶51 Jackson next argues he should be allowed to withdraw his no contest plea because the circuit court should have granted his request asking to replace trial counsel. We disagree.

---

[23] We reiterate that the issues presented to the postconviction court did not encompass the issues the Dissent has independently identified. Moreover, on appeal, Jackson abandoned all ineffective assistance claims he actually did make in his postconviction motion except for the one addressed in the majority opinion: That "Jackson was denied effective assistance of counsel when Jackson's trial counsel failed to confer with Jackson prior to Jackson's trial." (Capitalization edited for clarity.) His arguments are limited to his contention that he was forced to accept the plea because trial counsel was unprepared, which we reject. The Dissent has identified a new issue—that the plea to second-degree reckless homicide without the PTAC is the result of the ineffectiveness of his trial counsel. But, Jackson does not make that argument. He simply contended his lawyer was not prepared.

Because it is not this court's role to act as an advocate, we do not address the issues Jackson did not raise in the circuit court, and we likewise do not address the issues Jackson chose not to appeal. *See **Tina B. v. Richard H.***, 2014 WI App 123, ¶42, 359 Wis. 2d 204, 857 N.W.2d 432 (an appellate court "will not act as an advocate" by "searching the record for evidence that might support [an appellant's] argument"); ***State v. Pettit***, 171 Wis. 2d 627, 647, 492 N.W.2d 633 (Ct. App. 1992) ("We cannot serve as both advocate and judge."); ***State v. Dowdy***, 2012 WI 12, ¶4, 338 Wis. 2d 565, 808 N.W.2d 691 (an issue not raised in the circuit court will not be considered for the first time on appeal); ***A.O. Smith Corp.***, 222 Wis. 2d at 491. We also decline to act as the finder of fact by drawing conclusions about the credibility of witnesses, such as finding that Henderson's testimony is not credible and that Jackson's is. *See **Jezeski***, 316 Wis. 2d 178, ¶8.

The Dissent attempts to justify its advocacy by relying on ***United States v. Sineneng-Smith***, 140 S. Ct. 1575 (2020), despite the fact that in ***Sineneng-Smith***, the Court *reversed* the Ninth Circuit Court of Appeals for "depart[ing] so drastically from the principle of party presentation." ***Id.*** at 1578. The Court unanimously emphasized that courts are the "neutral arbiter[s] of matters the parties present." ***Id.*** at 1579 (citation omitted). The Court acknowledged that there may be an extraordinary circumstance when a court may appropriately take a "modest initiating role" particularly when necessary "to protect a *pro se* litigant's rights." ***Id.*** (citation omitted). "[O]ur system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.'" ***Id.*** (alteration in original) (citations omitted). The Dissent's advocacy here was neither modest nor was it done to protect a pro se litigant.

¶52 Whether to grant a party's request for appointment of new counsel is a matter within the circuit court's discretion. *Lomax*, 146 Wis. 2d at 359. "A discretionary determination 'must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination.'" *Id.* (citation omitted). In determining whether a circuit court erroneously exercised its discretion in denying a motion for substitution of counsel, we consider multiple factors, including: "(1) the adequacy of the court's inquiry into the defendant's complaint; (2) the timeliness of the motion; and (3) whether the alleged conflict between the defendant and the attorney was so great that it likely resulted in a total lack of communication that prevented an adequate defense and frustrated a fair presentation of the case." *Id.* The weight given to each factor depends on the circumstances. *Jones*, 326 Wis. 2d 380, ¶30.

¶53 While a circuit court "is required to inquire into the defendant's complaint[,]" a full inquiry into the defendant's reasons for requesting the substitution is not always required. *Lomax*, 146 Wis. 2d at 361. For example, a full inquiry may be unnecessary where "a defendant repeatedly makes such requests without any further evidence of the attorney's incompetency or conflict[.]" *Id.* Here, the circuit court's inquiry was somewhat cursory. However, Jackson had repeatedly requested new counsel throughout the pendency of his case and trial counsel was the fourth attorney appointed to represent him in this proceeding. Additionally, the circuit court appropriately explained that trial counsel was not required to file motions simply because Jackson wanted a motion filed, and aside from general complaints about a lack of communication, Jackson failed to establish trial counsel was incompetent or that there was an actual

conflict. Accordingly, the circuit court's inquiry was adequate under the circumstances.

¶54 The circuit court also appropriately considered the timeliness of Jackson's motion. Jackson filed a pro se motion on September 20, 2016, requesting new counsel. In his motion, Jackson asserted trial counsel had "failed to[:]" (1) "promptly comply" with his requests for information; (2) "act with reasonable diligence and promptness in representing" him; and (3) maintain an attorney-client relationship. Jackson also noted a pending grievance he had filed against trial counsel. The circuit court considered Jackson's written motion and additional statements he made at the final pretrial hearing on October 17, 2016. At that time, the scheduled trial date was just two weeks away, and Jackson's trial had already been rescheduled multiple times. In light of Jackson's repeated requests to have his three prior attorneys replaced—all of which in some way referenced a purported breakdown in communication and Jackson's frustrations that his attorneys were not filing the motions he wanted to pursue—the circuit court reasonably concluded Jackson's request was an attempt to further delay his trial.

¶55 Finally, the circuit court gave Jackson an opportunity to explain why he wanted trial counsel replaced. Jackson vaguely explained that trial counsel "doesn't keep in contact with me[,]" had not "filed … motions" Jackson wanted him to pursue, "hasn't been properly representing me at all[,]" and "hasn't done anything for me." In denying Jackson's request, the circuit court noted the multiple times Jackson's trial had been rescheduled.

¶56    Having reviewed the circuit court's decision in light of the **Lomax** factors, we conclude the circuit court did not erroneously exercise its discretion in denying Jackson's motion to replace trial counsel.

## C. Interests of Justice

¶57    Finally, Jackson asserts he is entitled to plea withdrawal, or alternatively, resentencing, to correct a miscarriage of justice and violation of his due process rights.  We again disagree.

¶58    "The court of appeals has the discretionary power to reverse a conviction in the interest of justice."  **State v. Avery**, 2013 WI 13, ¶23, 345 Wis. 2d 407, 826 N.W.2d 60.  We may order a new trial under WIS. STAT. § 752.35 (2019-20) "if it appears from the record that the real controversy has not been fully tried" or "it is probable that justice has for any reason miscarried."  We exercise this discretionary reversal power only in exceptional cases, *see* **State v. Kucharski**, 2015 WI 64, ¶23, 363 Wis. 2d 658, 866 N.W.2d 697, and we exercise this power "sparingly and with great caution[,]" **State v. Williams**, 2006 WI App 212, ¶36, 296 Wis. 2d 834, 723 N.W.2d 719.

¶59    Jackson does little more than repeat the same arguments we have already rejected in asserting this court should take the extraordinary step of allowing him to withdraw his plea or to remand for resentencing in the interests of justice.  As we have already explained, Jackson did not establish ineffective assistance of counsel, and the circuit court did not err in not allowing trial counsel to withdraw prior to the trial date.  And, despite asserting due process violations, Jackson has not developed any argument as to what additional due process violations he purportedly suffered aside from the aforementioned arguments we have already rejected.  To the extent we have already rejected those claims, we

need not repeat our reasoning here, and to the extent Jackson has not developed additional arguments as to plea withdrawal in the interests of justice, we do not address his claim further. *See **State v. Pettit***, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (appellate courts may decline to address undeveloped and inadequately briefed issues).

¶60     As to his assertion he is entitled to resentencing in the interests of justice, Jackson does little more than complain that he was sentenced more harshly than his co-actors. While he broadly asserts the circuit court erred by imposing a lengthier sentence than his co-actors received, he has otherwise failed to develop or adequately brief this claim and we therefore will not address it. *See **id***.

### III. CONCLUSION

¶61     In sum, Jackson failed to establish he received ineffective assistance. He therefore is not entitled to withdraw his plea, as he has failed to establish a manifest injustice. We also conclude the circuit court did not erroneously exercise its discretion in denying Jackson's pretrial request to have trial counsel replaced, and we are not otherwise convinced this case warrants the exercise of our discretionary reversal authority.

*By the Court.*—Judgment and order affirmed.

Not recommended for publication in the official reports.

No.   2019AP2383-CR(D)

¶62    REILLY, J. (*dissenting*).  Daimon Von Jackson, Jr. was coerced into becoming the "shooter" of Maurice Carter as a result of:

1. the constitutionally ineffective representation of Attorney Scott F. Anderson;

2. the State's breach of its pretrial offer; and

3. the court's defective plea colloquy.

¶63    A "reasonably competent attorney"[1] would have corrected the circuit court at both the final pretrial hearing and the trial/plea date that Jackson was not facing forty-six years in prison on an armed robbery charge if he went to trial.  A reasonably competent attorney would have challenged the State's breach of its plea offer.  A reasonably competent attorney would have understood that a second-degree reckless homicide charge is materially different from a charge of second-degree reckless homicide *as a party to the crime*.  A reasonably competent attorney would have provided his client with a pretrial offer and discussed the offer with his client prior to the day of trial.  A reasonably competent attorney would have met with and prepared both his client and witnesses prior to the trial date.  A reasonably competent attorney would have procured, produced, and argued evidence that Jackson was not the "shooter" but was blocks away when Bobby Henderson shot Carter.  I respectfully dissent and would grant Jackson's

---

[1] *See* **Strickland v. Washington**, 466 U.S. 668, 687 (1984).

request to withdraw his plea on the grounds that the plea hearing was defective, that the State's breach of its plea offer was prejudicial, and that Anderson's complete abandonment of Jackson in all phases of his representation was prejudicial.

¶64 I begin by relating the objective facts, which show that Jackson was the lookout rather than the shooter. I then show Anderson's deficient performance by examining solely the two-week period between Jackson's final pretrial (October 17, 2016) and his trial date (November 1, 2016). Next, I show the State's breach of its pretrial plea offer (unobjected to by Anderson), and I conclude by examining the circuit court's defective plea colloquy (also unobjected to by Anderson). The effect of all of the above resulted in prejudice to Jackson: he became the "shooter" rather than the lookout.

*The Murder of Maurice Carter*

¶65 Carter was shot and killed the evening of December 11, 2014, by two men. Tauries Murry was an eyewitness to the shooting. Murry told police that he and Carter were outside of 1013 Grand Avenue when two black males approached. Murry described "one as a shorter fat, caramel-skinned black male wearing a light grey hoodie and grey sweatpants" and the other as "taller, dark skinned, wearing a black sweatshirt and black hat." The two men ran to Carter, a "scuffle" occurred, Murry heard a gunshot, Carter fell to the ground, and the two men went through Carter's pockets. The two men fled the scene when Murry drove "his vehicle at a high rate of speed toward the two suspects in an attempt to get them away from his friend."

¶66 An ammunition magazine recovered at the scene had Henderson's fingerprints on it. Police picked up Henderson the next morning and testing of

Henderson's clothing revealed Carter's DNA on them. Henderson told police a story (which police used in the criminal complaint) that he and Jackson were the two who were going to rob Carter, but when they got there, he went to Murry's car and Jackson alone approached Carter. Henderson told police that Carter and Jackson began scuffling, and he then heard two gunshots. Henderson claimed he ran away by himself and met up with Travenn Webster and Jackson back at the get-away car. Surveillance video obtained by police from Potawatomi Casino showed Henderson, Webster, and Jackson at Potawatomi five hours after the shooting. Henderson was wearing all black and a black hat, Webster was wearing a light grey hoodie and grey sweatpants, and Jackson was dressed in all white.

¶67 Jackson was picked up and gave a statement to police in which he admitted that he was part of the robbery plan but that he was the "lookout" and was waiting at the car when the shooting occurred. Jackson claimed he never intended Carter to be harmed. Jackson's version of events was consistent up to and through his sentencing.

¶68 If we examine the objective facts and the eyewitness statement of Murry, we know:

1. Henderson's fingerprints were on the gun magazine;

2. Carter's DNA was on Henderson's clothing;

3. The Potawatomi surveillance video shows Henderson and Webster dressed just as Murry described the two men who shot Carter.

¶69 If we examine the statement Henderson gave police, which police used in the criminal complaint, we observe that it is inconsistent with the eyewitness's statement, which placed Henderson with Webster when Carter was

3

shot. Henderson's story never puts him in contact with Carter, which is inconsistent with Carter's DNA being on Henderson's clothing. The eyewitness stated the two men in black and grey rifled through Carter's pockets and ran away together. A man dressed in white was never placed at the scene of Carter's murder, and police produced no objective evidence that Jackson was at the scene of Carter's murder.

*Deficient Performance*

¶70　A defendant who seeks to withdraw his or her plea after sentencing must establish by clear and convincing evidence that plea withdrawal is necessary to correct a manifest injustice. *State v. Dillard*, 2014 WI 123, ¶36, 358 Wis. 2d 543, 859 N.W.2d 44. "A manifest injustice occurs when there are serious questions affecting the fundamental integrity of the plea which rendered it unknowing, involuntary, and unintelligently entered." *State v. Denk*, 2008 WI 130, ¶71, 315 Wis. 2d 5, 758 N.W.2d 775. There are two ways for a defendant to establish that his plea was unknowing, involuntary, or unintelligent. One way is for the defendant to allege that factors extrinsic to the plea colloquy, such as trial counsel's ineffective assistance, rendered a defendant's plea infirm. *State v. Bentley*, 201 Wis. 2d 303, 311, 548 N.W.2d 50 (1996).

¶71　To prove ineffective assistance of counsel a defendant must prove that (1) counsel performed deficiently and (2) the defendant suffered prejudice as a result of the deficient performance. *State v. Thiel*, 2003 WI 111, ¶18, 264 Wis. 2d 571, 665 N.W.2d 305 (citing *Strickland*, 466 U.S. at 687). Deficient performance occurs if counsel's representation falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. The right to effective assistance of counsel extends to the plea bargaining process as it is a "critical" stage in the

4

criminal justice system. *See Missouri v. Frye*, 566 U.S. 134, 144 (2012); *Lafler v. Cooper*, 566 U.S. 156, 162 (2012); *State v. Frey*, 2012 WI 99, ¶¶57-60, 343 Wis. 2d 358, 817 N.W.2d 436.

¶72    Remarkably, the Majority does not unequivocally conclude that Anderson's representation was deficient; the Majority "assume[s]" that only his "failure to communicate constituted deficient performance." Majority, ¶¶40-42. Remarkable in many ways. Remarkable as the circuit court found: "I cannot imagine a situation where an attorney only meeting with the client twice over the seven months leading up to the day of a murder trial is not deficient." Remarkable as our supreme court suspended Anderson's license to practice law and assessed costs of over $19,000 against him for his deficient/unprofessional representation of Jackson in this case.[2] *Office of Lawyer Regulation v. Anderson*, 2020 WI 82, ¶1, 394 Wis. 2d 190, 950 N.W.2d 191 (hereinafter *Anderson*). Remarkable as Anderson failed to prepare for trial by not meeting with Jackson (even when ordered to do so by the court) before trial. Remarkable as Anderson did not know

---

[2] See *Office of Lawyer Regulation v. Anderson*, 2020 WI 82, ¶¶3-17, 394 Wis. 2d 190, 950 N.W.2d 191 (hereinafter *Anderson*), for additional discussion of Anderson's representation of Jackson. *See also Sisson v. Hansen Storage Co.*, 2008 WI App 111, ¶11, 313 Wis. 2d 411, 756 N.W.2d 667 ("'Judicial notice may be taken at any stage of the proceeding,' and this means that an appellate court may take judicial notice when that is appropriate." (citations omitted)).

Our supreme court upheld the referee's findings of fact and conclusions of law that Anderson (1) failed to reasonably consult with Jackson about the means by which Jackson's defense objectives were to be accomplished (SCR 20:1.4(a)(2)), (2) failed to keep Jackson reasonably informed about the status of his action (SCR 20:1.4(a)(3)), and (3) failed to promptly comply with reasonable requests made by Jackson for information about his case (SCR 20:1.4(a)(4)). *Anderson*, 394 Wis. 2d 190, ¶¶18, 37, 44.

I acknowledge our supreme court's discussion in *State v. Cooper*, 2019 WI 73, ¶¶21-22, 387 Wis. 2d 439, 929 N.W.2d 192, where the court explained that a violation of the rules of professional conduct does not necessarily mean that there has been ineffective assistance of counsel. Given the facts of this case in which Anderson abandoned Jackson, there is ineffective assistance of counsel along with professional misconduct.

that the armed robbery charge had been dismissed ten months prior to the final pretrial date. *See* Majority, ¶8. Remarkable as Anderson did not know that the State changed its plea offer on the trial date to remove the "party to a crime" status. Remarkable as Anderson did not challenge the State's breach of its plea offer. And remarkable in that Anderson allowed the court to use the facts in the criminal complaint (Henderson's account) as the basis for Jackson's plea when he knew that Jackson had never admitted to being the shooter. Anderson was not only deficient, he was nonexistent to Jackson.

*Breach of Pretrial Offer*

¶73    On the morning of October 17, 2016, the State, in an e-mail to Anderson, offered to amend the charge of felony murder to "party to crime of [second-degree] reckless homicide." In return for Jackson's plea, the State would dismiss and read in all other charges (including drug charges in a separate case) and would recommend unspecified prison. The offer stated that it would remain "open until the Friday before the trial" (October 28, 2016). Later that day, the State told Anderson and the court that it would "keep the offer open until the day of the trial" (November 1, 2016). Anderson admitted that he did not discuss the offer with the State or Jackson.

¶74    At the final pretrial later in the day on October 17, 2016, Jackson asked that the circuit court remove Anderson as his lawyer. The court refused: "I will not allow Mr. Anderson to withdraw, whether it be on your request or anyone else's. So, Mr. Anderson, I ask that you meet with [Jackson] and that you also be prepared to proceed on November 1st. Again it is the number one trial." The court also instructed Anderson to submit a witness list by Friday, October 21, 2016, with the dates of birth of the witnesses. Anderson did not do so. The court

had previously ordered Anderson to file his proposed jury instructions by the October 17, 2016 final pretrial. Anderson did not do so, and the court made no comment on Anderson's failure to do so. Anderson did not prepare or file any proposed jury instructions prior to the trial date.

¶75 At the October 17 pretrial, the circuit court asked the State what its last pretrial offer was. The State responded that it had sent Anderson an offer via e-mail, but it did not have a copy in the courtroom and it "would make a record of that on the day of trial." The court asked the State if its pretrial offer was being held open for any period of time. The State responded, "Given that there's apparently some conversations that need to take place, I will keep the offer open *until the day of trial*." (Emphasis added.) As noted above, Anderson did not discuss the State's offer with Jackson, and the record is unclear as to whether he ever notified Jackson of the offer.[3] Anderson made no record with the court on October 17 or on November 1 that the State's pretrial offer was for a plea to second-degree reckless homicide *as party to a crime*.

¶76 In *Dillard*, 358 Wis. 2d 543, ¶90, our supreme court held that "[a] defendant's decision whether to go to trial or plead no contest (or guilty) is generally the most important decision to be made in a criminal case. A defendant

---

[3] Anderson testified that he "believe[d]" the offer was "conveyed" to Jackson: "My note showed a letter to him 10-18-16. But I don't know whether that was in that letter or not." The purported letter does not appear to be in the record. In *Anderson*, our supreme court explained that "[o]n October 18, 2016, Attorney Anderson forwarded D.J. a plea offer which expired on October 28, 2016. Attorney Anderson promised to meet with D.J. 'to discuss it and all other matters.' Attorney Anderson did not communicate or meet with D.J. between October 18 and October 28, 2016." *Anderson*, 394 Wis. 2d 190, ¶14. There is no proof of the letter in this record, and, further, this series of events makes no sense as the letter providing the October 28 deadline was supposedly sent on October 18, but Anderson knew on October 17 that the offer would be open until the day of trial (November 1).

should have the benefit of an attorney's advice on this crucial decision." Defense counsel has a duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused. *Frye*, 566 U.S. at 145. When defense counsel allows an offer to expire without advising the defendant or allowing him to consider it, defense counsel does not render the effective assistance the Constitution requires. *See id.* The question then becomes one of prejudice, and *Frye* held that "[t]o show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel." *Id.* at 147. We have a clear showing of prejudice as Jackson (and Anderson) prepared the plea questionnaire on November 1 with the understanding that Jackson was pleading to second-degree reckless homicide *as party to a crime*.

¶77 Anderson never made the circuit court aware at the plea hearing that the state's pretrial offer was for a plea to second-degree reckless homicide *as party to a crime*. The Majority acknowledges that the State agreed to hold its offer open until the day of trial but then inexplicably finds neither deficient performance nor prejudice when the State changed the offer that it had agreed to keep open. *See* Majority, ¶11. Anderson was ordered by the court on October 17 to meet with Jackson prior to the trial. Anderson failed to do so. A reasonably competent attorney would meet with his client before going to trial on a murder charge (especially when ordered to do so by the court) and especially where an expiring plea offer was on the table. Anderson admitted at the *Machner*[4] hearing that he

_____

[4] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

"should have met with" Jackson. Similar to *Frye*, Anderson received the written, formal plea offer from the State by e-mail, and he failed to properly communicate with Jackson regarding the offer.

*Defective Plea Colloquy*

¶78 The second way for a defendant to establish that his plea was unknowing, involuntary, or unintelligent is to assert that the plea colloquy was defective on its face and that he or she did not otherwise know the information that should have been provided.[5] *State v. Bangert*, 131 Wis. 2d 246, 389 N.W.2d 12 (1986). Under *Bangert*, the court has an obligation to address the defendant personally when he or she enters a guilty plea and to undertake a colloquy to ensure the defendant understands the nature of the charge, the constitutional rights he or she is giving up by pleading, and the potential punishment for the crime. *See State v. Brown*, 2006 WI 100, ¶¶33-35, 293 Wis. 2d 594, 716 N.W.2d 906; *see also* WIS. STAT. § 971.08. "An understanding of the nature of the charge must include an awareness of the essential elements of the crime." *Bangert*, 131 Wis. 2d at 267.

¶79 The defects in Jackson's plea hearing are palpable. While the circuit court did ask Jackson if he understood the charge and the elements of the charge

---

[5] Where the defendant alleges that the procedure set forth in WIS. STAT. § 971.08 was not followed or that the court did not fulfill its other mandated duties at the plea hearing, he or she may move for plea withdrawal pursuant to *State v. Bangert*, 131 Wis. 2d 246, 389 N.W.2d 12 (1986). *See State v. Brown*, 2006 WI 100, ¶¶33-35, 293 Wis. 2d 594, 716 N.W.2d 906. The initial burden falls on the defendant to make a prima facie showing that the plea was accepted without conformity with mandatory procedures. *Bangert*, 131 Wis. 2d at 274; *Brown*, 293 Wis. 2d 594, ¶36. The defendant must also allege that he or she did not know or understand the information. *Bangert*, 131 Wis. 2d at 274. Once the defendant makes these showings, the burden shifts to the State to prove by clear and convincing evidence that the defendant's plea was nevertheless knowingly, voluntarily, and intelligently entered. *Id.*

of second-degree reckless homicide (Jackson said he did), the problem is that Jackson, at this point in the plea hearing, thought he was pleading to second-degree reckless homicide *as a party to the crime*. After the court inquired about Jackson's understanding of the charge, it noted, "As I look at the plea questionnaire, the plea questionnaire has party to the crime"; however, the court then deflected the difference between a charge of second-degree reckless homicide versus a charge of second-degree reckless homicide *as a party to the crime* by stating, "The elements are the same." Anderson admitted that he had misunderstood the charge: "I wasn't sure regarding the amended information." The court accepted Jackson's plea without inquiring whether Jackson understood the difference between second-degree reckless homicide and second-degree reckless homicide as a party to the crime. The prosecutor, perhaps uncomfortable with the court's acceptance of Jackson's plea to the straight-up charge of second-degree reckless homicide, asked the court to inquire of "Mr. Jackson whether or not he needed more time to speak to Mr. Anderson regarding the change of party to the crime versus non-party to the crime." The court failed to review the essential difference with Jackson as to what it meant to plea to a straight-up charge of second-degree reckless homicide without the *party to crime* status, i.e., Jackson was now the shooter.

¶80 The court also erred during the plea colloquy when it said that the elements of second-degree reckless homicide "are the same" as the elements the State would need to prove if it charged Jackson with second-degree reckless homicide as a party to the crime. As stated in *Bangert*, a defendant must be aware of the "essential elements" of the crime being pled to. *Id.* at 267. The essential elements between a charge of straight-up second-degree reckless homicide and second-degree reckless homicide *as a party to the crime* are not the same. In the

10

latter, the State (having an absence of proof that Jackson was at the scene of Carter's shooting) would need to prove that Jackson "[i]ntentionally aid[ed] and abet[ed] the commission" of the crime or was "a party to a conspiracy with another to commit" the crime. *See* WIS. STAT. § 939.05(2)(a)-(c); WIS JI—CRIMINAL 400, 406.

¶81 The "essential" difference is not in what penalty Jackson faced; the "essential" difference is that in being charged as a *party to the crime*, Jackson could show at sentencing what he all along acknowledged—that he was part of the plan to rob Carter at gunpoint but maintain his assertion that he had no intent to physically harm Carter. *See **State v. Cecchini***, 124 Wis. 2d 200, 212-14, 368 N.W.2d 830 (1985), *overruled on other grounds by **State v. Bangert***, 131 Wis. 2d 246, 389 N.W.2d 12 (1986) ("It is evident that a defendant cannot make a truly voluntary or intelligent admission that he or she committed the offense charged unless he or she is aware of its essential elements and their relationship to the facts of the particular case; the defendant must be given 'notice of what he is being asked to admit.'" (citation omitted)). By requiring the plea to be to a straight-up charge of second-degree reckless homicide without the party to a crime status, Jackson became the cold-blooded killer of Carter. For anyone to suggest that a judge at sentencing would treat a cold-blooded killer the same as a "lookout" is sorely lacking in the understanding of what a judge at sentencing is tasked with doing.

¶82 Further, at the final pretrial, the circuit court told Jackson that if he went to trial he would be facing three charges: felony murder, possession of a firearm by a felon as a party to the crime, and armed robbery with use of force as a party to the crime. The court explained, "So [Jackson], if you are convicted on all three counts, you face 117 years in prison and $225,000 in fines." The court erred

as the armed robbery charge had been dismissed nine months earlier on January 8, 2016.[6] Neither Anderson nor the State[7] corrected the court. Due to the silence of Anderson and the State, Jackson approached his trial date with the understanding that he was facing forty-six years in prison on the armed robbery charge if he went to trial. Our supreme court held in **Dillard**, 358 Wis. 2d 543, ¶91, that trial counsel performed deficiently when she failed to ascertain that the persistent repeater enhancer was, as a matter of law, inapplicable to the defendant and when she advised the defendant to enter the plea agreement based in large part on the State's offer to drop that enhancer.[8] *See also* **State v. Douglas**, 2018 WI App 12, ¶11, 380 Wis. 2d 159, 908 N.W.2d 466 (plea involuntary where defendant "was incorrectly informed that he faced a potential sentence of 100 years if convicted of both first and second-degree sexual assault" despite the fact that legally, he could not be convicted of both offenses).

¶83 The circuit court erred in telling Jackson that he faced forty-six years on the armed robbery charge. Anderson likewise erred in not correcting the court

---

[6] The State did not contest the dismissal of the armed robbery charge as it is an underlying felony of the charge of felony murder. At the **Machner** hearing, the State asked Anderson, "Mr. Anderson, do you recall, this may have been before your representation of Mr. Jackson. The third count was actually dismissed while the case was pending before Judge Gasiorkiewicz. Correct?" Anderson answered, "I don't know."

[7] The prosecutor who was present on January 8, 2016, and had conceded to the armed robbery charge being dismissed, was present in court on October 17, 2016. The prosecutor did not correct the court.

[8] In **Dillard**, our supreme court concluded that the defendant's trial counsel was constitutionally ineffective based on "trial counsel mistakenly advis[ing] the defendant he would face a mandatory sentence of life in prison without the possibility of extended supervision if he did not accept the plea agreement." **State v. Dillard**, 2014 WI 123, ¶¶81-82, 91, 358 Wis. 2d 543, 859 N.W.2d 44. The defendant believed that he faced a persistent repeater enhancer on an armed robbery charge, so he accepted the State's offer, but after sentencing it became clear that the persistent repeater enhancer could not be applied to the defendant. *Id.*, ¶¶78-79.

that the armed robbery charge was not in play. The prosecutor erred, as an officer of the court, in not correcting the court that the armed robbery charge had been dismissed. Thus, Jackson was left to understand that the armed robbery charge had been reinstated. Jackson's plea was not knowing as he thought he faced an additional forty-six years in prison if he went to trial.

*Prejudice*

¶84   It is well-established that to succeed on his ineffective assistance of counsel claim, Jackson must show that Anderson's deficient performance was prejudicial. *Strickland*, 466 U.S. at 687. Counsel's failure to provide accurate information and advice to a defendant regarding his case in the context of a plea agreement can create prejudice. *See Frye*, 566 U.S. at 148; *Lafler*, 566 U.S. at 168. In order to satisfy the prejudice prong of the *Strickland* test, the defendant seeking to withdraw his or her plea must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Lafler*, 566 U.S. at 163 (quoting *Strickland*, 466 U.S. at 694). I am more than satisfied that Anderson's multiple failures coupled with the breach of the plea offer by the State and the court's error in telling Jackson that the armed robbery charge was back in play all prejudiced Jackson. Jackson became the "shooter" rather than the "lookout."

¶85   The State's October 17, 2016 offer was for Jackson to plead to second-degree reckless homicide as *party to a crime*. We know that Jackson

would have accepted the State's pretrial offer.[9] Anderson admitted that Jackson was "upset" and "frustrated" at his plea hearing. When the tables were turned on Jackson on November 1, he was faced with pleading to second-degree reckless homicide without the party to a crime status or going to trial (with the armed robbery charge now back in play) with a lawyer who was unprepared and who had subpoenaed no witnesses. Anderson abandoned Jackson when he told the circuit court that it could use the criminal complaint "as a factual basis for the plea," as those facts consisted of Henderson saying that Jackson was the shooter. The court stated that it had reviewed the criminal complaint and would use it as the factual basis for the change of plea.

¶86 The circuit court explained in its postconviction decision that "[i]n this case the record was explicit that [Jackson] was pleading as a principal rather than an accomplice or conspirator." Due to Anderson's abandonment of Jackson, Jackson became the "shooter." When Jackson maintained his claim that he was the lookout with both the PSI writer and the court at sentencing, he was not "believed" by the court. The sentencing court stated, "I fully believe based on everything that I have read that you were the shooter in this case or involved in

---

[9] The State filed an amended information the morning of November 1, 2016, that charged second-degree reckless homicide *without* the party to a crime status. The court addressed Anderson during the later plea hearing: "As I look at the plea questionnaire, the plea questionnaire has party to the crime. My understanding is that Mr. Von Jackson is not pleading to Count 1 as a party to the crime, but is pleading to second degree reckless homicide as a repeater with use of a dangerous weapon, is that correct?" The State responded, "Yes." Anderson stated, "*I reviewed it as a party to the crime. I wasn't sure regarding the amended information.*" (Emphasis added.) The court asked Anderson, "All right, do you need any additional time then to talk to Mr. Von Jackson?" Anderson said, "No." The court did not ask Jackson if he needed more time or if he understood the significance of the "party to a crime" status being removed. At the *Machner* hearing, Anderson admitted that he was "surprise[d]" during the plea hearing that the charge was without the party to a crime status. Anderson testified that the facts serving as the basis for Jackson's guilty plea should have been as "a look-out" and that "his role was not as the shooter."

this shooting. Your lack of remorse, your lack of responsibility is telling." Jackson became the cold-blooded killer rather than what all the credible facts support—that he was the lookout.[10]

¶87    Further, the extent of the prejudice to Jackson is evident in his co-defendants' sentences. Webster pled to robbery as *party to a crime* and received ten years' initial confinement and five years' extended supervision. Henderson pled to second-degree reckless homicide as *party to a crime* and received twelve years' initial confinement and eight years' extended supervision. Jackson was coerced into being the "shooter" and was sentenced to twenty years' initial confinement and ten years' extended supervision.

*Conclusion*

¶88    Jackson is not an innocent man in Carter's death and has never claimed to be. Jackson should have been allowed to plea to and be sentenced for what he did do:  act as a lookout for his co-defendants in the armed robbery of Carter. When we allow an accused to be abandoned by his lawyer; when we allow the State to take advantage of that abandonment by breaching its plea offer; when we allow a court to err in its understanding of the charges an accused is facing; and when we allow a court to erroneously tell a defendant that "the elements are the same" without explaining the "essential" differences between a straight-up charge of second-degree reckless homicide versus a charge of second-degree

---

[10] This is not a situation where the State's case was ironclad. *See Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").

15

reckless homicide *as a party to the crime*, then we and the entire justice system fail.[11] I dissent.

---

[11] The Majority suggests that it is improper to address all the obvious failings in this case, as it requires us to take the position of an advocate: "Because it is not this court's role to act as an advocate, we do not address the issues Jackson did not raise in the circuit court, and we likewise do not address the issues Jackson chose not to appeal." Majority, ¶50 n.23. This concept was recently addressed by the United States Supreme Court in *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579, 1582 (2020), where the Court held that the lower court had deviated too far from the "principle of party presentation" when it decided a case based on arguments not raised by the parties. At the same time, however, the Court explained that "[t]he party presentation principle is supple, not ironclad. There are no doubt circumstances in which a modest initiating role for a court is appropriate" and "a court is not hidebound by the precise arguments of counsel." *Id.* at 1579, 1581.

There is clearly deficient performance by trial counsel in this case, and if the Majority is correct that we cannot address other failures—all related to the ineffective assistance of trial counsel—based on postconviction counsel's failure to brief the issues to this court, then postconviction counsel was likewise ineffective. Under these circumstances, Jackson would have been better off if his attorney had filed a no-merit report, as we would then be obligated to search the record for any viable issues. The failures set forth above are clearly viable issues, and, therefore, in the interest of justice, we should address those deficiencies rather than tell a defendant that due to his or her lawyer's deficiencies we cannot hear his or her claims or give relief due to our procedural rules. The advancement of justice should override our desire for "judicial economy." In this case, we have deficient performance by the court, prosecutor, and defense attorney. We have a prosecutor who breached his plea offer. We have a circuit court judge who was unprepared for trial by thinking that the armed robbery charge was still in play. We have a prosecutor who had a duty as an officer of the court to correct the court regarding the armed robbery charge. And we have Anderson, who did nothing. The Majority excuses everyone except the person who holds the constitutional right to a fair proceeding.

The Majority faults the use of *Sineneng-Smith* for support under these circumstances, noting that "the Court reversed the Ninth Circuit Court of Appeals" for its "drastic[]" departure from the arguments of the parties. Majority, ¶50 n.23. Jackson argues that he should be allowed to withdraw his plea based on ineffective assistance of counsel, and my discussion does not depart from that issue, let alone depart "drastically." See *Sineneng-Smith*, 140 S. Ct. at 1578. The Majority acknowledges and assumes that Anderson's lack of communication with Jackson was deficient performance. One of those failures was the failure to communicate the State's pretrial offer. A competent attorney would have done so. Further, the Majority suggests that "a court may appropriately take a 'modest initiating role' particularly when necessary 'to protect a pro se litigant's rights.'" Majority, ¶50 n.23. The *Sineneng-Smith* Court did not pronounce such a bright-line rule, as the Court noted only that "[i]n criminal cases, departures from the party presentation principle *have usually* occurred 'to protect a *pro se* litigant's rights'" and went on to note that the "general rule" of the principle of party presentation applies when parties are "represented by competent counsel." *Sineneng-Smith*, 140 S. Ct. at 1578-79 (emphasis added; citations omitted). As addressed above, Jackson was not "represented by competent counsel."

(continued)

We claim that justice is blind, yet we deny justice when we deliberately blind ourselves to the facts in the record when the claim on appeal is the constitutional ineffectiveness of counsel. Does the record in this case, one the Majority is obligated to review, reflect a "manifest injustice" based upon the ineffective assistance of counsel? *See* **Dillard**, 358 Wis. 2d 543, ¶36. Does this record reflect serious questions "affecting the fundamental integrity of [Jackson's] plea"? *See* **State v. Denk**, 2008 WI 130, ¶71, 315 Wis. 2d 5, 758 N.W.2d 775. It does.